## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Special Agent Eric Mercer, being duly sworn, state the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have worked there since January 2020. I am currently assigned to the Bridgewater, Massachusetts, Field Office. Prior to my employment with the ATF, I was employed as a Trooper with the New Hampshire State Police from 2018 to 2020. As an ATF Special Agent, I have training and experience regarding investigations involving firearms and narcotics trafficking and the possession of firearms by prohibited persons, including felons, parolees, illegal aliens, narcotics users, and narcotics traffickers. I have additionally received training and experience conducting investigations involving the possession and use of firearms in violent crime and narcotics offenses. As a result of my training and experience, I am familiar with methods commonly utilized by firearms and narcotics traffickers, as well armed offenders, in conducting their business.

2. I have participated in various aspects of firearms and narcotics investigations, including physical surveillance, surveillance of controlled purchases involving undercover agents and/or cooperating witnesses, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and the debriefing of defendants, informants, and witnesses who had personal knowledge regarding firearms and narcotics trafficking organizations.

3. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws.

4.      This affidavit is being submitted in support of an application for arrest warrants for Alason FERREIRA-PEIXOTO and Lucas NASCIMENTO-SILVA, for federal firearms offenses.

5.      There is probable cause to believe that FERREIRA-PEIXOTO and NASCIMENTO-SILVA have committed the following federal crimes (1) engaging in the business of dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A), and conspiracy to engage in the business of dealing in firearms without a license in violation of 18 U.S.C. § 371.

6.      During this investigation, a Cooperating Witness ("CW-1") made controlled purchases of commercially manufactured firearms and ammunition as well as Privately Made Firearms ("PMF"), sometimes referred to as "ghost guns." A PMF does not have a serial number like commercially manufactured firearms. Based on my training and experience, a PMF satisfies the definition of "firearm" for the purposes of 18 U.S.C. § 922(a)(1)(A).

7.      CW-1 has requested that his/her identity not be revealed for fear of reprisal or harm to his/her physical safety. I am aware of CW-1's identity and have met with CW-1 personally. CW-1[1] has provided accurate, truthful, and reliable information to law enforcement, including the ATF, in the past and continues to do so to the present. CW-1 is presently receiving monetary benefits from the ATF. CW-1 is also seeking protection from retaliation based upon CW-1's cooperation with law enforcement in this investigation, including possible relocation.

8.      The information contained in this affidavit is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillance, information from

---

[1] CW-1 has five (5) prior arrests in the Commonwealth of Massachusetts resulting in 14 entries on his Massachusetts Board of Probation summary. All prior arrests resulted in case dismissals. CW-1 additionally has previous arrests related to immigration offenses.

CW-1, public records, database checks, and other investigations. The dates and times in this affidavit are approximate. Because this affidavit is submitted for the limited purpose of supporting issuance of arrest warrants for FERREIRA-PEIXOTO and NASCIMENTO-SILVA, I have not presented every fact learned during the investigation, but only that information necessary to fully support probable cause for arrest warrants.

## PROBABLE CAUSE

9. During late May of 2024, CW-1 informed agents of communications with an individual that had previously sold CW-1 firearms and controlled substances under the supervision of the ATF (hereinafter "Subject One"). CW-1 reported that Subject One sent photographs and videos of firearms that were advertised as available for sale. I have reviewed the photographs and videos sent to CW-1 and observed these media files to depict a suspected AR-15 style rifle, as well as commercially manufactured pistols and PMFs.

10. CW-1 reported to agents that Subject One stated he had a firearm source of supply in North Carolina and could acquire a rifle and two pistols for sale. CW-1 reported that Subject One advertised a price of $2,200 for the rifle, and $1,200 for each of the pistols. On June 4, 2024, CW-1 informed agents that Subject One told him/her that his associates were traveling to North Carolina to acquire the firearms. On June 6, 2024, CW-1 informed agents that Subject One told him/her that his associates were unable to acquire the firearms.

11. On May 30, 2024, CW-1 informed agents that he/she was contacted by FERREIRA-PEIXOTO. CW-1 identified FERREIRA-PEIXOTO as the driver of a black Ford

3

Fusion used during a prior drug deal with Subject One.[2] CW-1 reported FERREIRA-PEIXOTO directed CW-1 to meet him at the Yarmouth Resort in West Yarmouth, MA.

12.     CW-1 reported he/she met with FERREIRA-PEIXOTO in a 2nd floor hotel room on the east side of the Yarmouth Resort. CW-1 reported FERREIRA-PEIXOTO told him/her that he also had a firearm source of supply in North Carolina and could acquire large quantities of firearms for sale. CW-1 reported FERRERIA-PEIXOTO stated he wanted to sell firearms directly to CW-1, without Subject One, so that FERREIRA-PEIXOTO would make more money.

13.     On June 4, 2024, CW-1 informed agents that FERREIRA-PEIXOTO contacted him/her and stated he was going to obtain firearms for sale. On June 5, 2024, FERREIRA-PEIXOTO sent CW-1 photographs and videos depicting at least six (6) suspected pistols. CW-1 reported FERREIRA-PEIXOTO offered to sell two of the pistols for a price of $3,200 collectively. I later directed CW-1 to arrange the purchase of the firearms from FERREIRA-PEIXOTO.

### *JUNE 6, 2024 – CONTROLLED BUY FROM FERREIRA-PEIXOTO*

14.     On June 6, 2024, CW-1 made a controlled purchase of two 9mm pistols from FERREIRA-PEIXOTO in West Yarmouth, MA. Prior to the controlled purchase, investigators met with CW-1 at a pre-determined location to conduct a pre-operational briefing. CW-1 was equipped with electronic surveillance equipment, as well as a U/C vehicle, to record and monitor the transaction. Agents provided CW-1 with government funds to purchase the firearms. CW-1 and the U/C vehicle were searched for contraband and currency with negative results.

---

[2] Following the drug buy, CW-1 initially identified the driver of the Ford Fusion as the registered owner based on an RMV photograph. CW-1 later met with FERREIRA-PEIXOTO, who introduced himself as "Alason." CW-1 was shown photographs of both FERREIRA-PEIXOTO and the registered owner of the vehicle, and identified FERREIRA-PEIXOTO as the individual he/she knows to be "Alason."

4

15. Surveillance personnel were assigned to the Yarmouth Resort in West Yarmouth, MA, and CW-1 was under constant surveillance to and from the location. CW-1 parked in the east side parking lot of the Yarmouth Resort. While at the Yarmouth Resort, CW-1 received a photograph from FERREIRA-PEIXOTO consistent with FERREIRA-PEIXOTO seated as the front passenger in a silver vehicle.

16. CW-1 reported that FERREIRA-PEIXOTO arrived in the east side parking lot of the Yarmouth Resort as the passenger in a silver pickup truck. CW-1 reported FERREIRA-PEIXOTO entered the U/C vehicle with a backpack. CW-1 reported FERREIRA-PEIXOTO produced two pistols from the backpack, and he/she observed additional pistols inside of the backpack. CW-1 reported he/she discussed purchasing additional firearms from FERREIRA-PEIXOTO. CW-1 paid FERREIRA-PEIXOTO $3,100 government funds in exchange for the two pistols.

17. CW-1 left the area and was escorted to a pre-determined location. Surveillance personnel observed a silver pickup truck pull out of the Yarmouth Resort in front of the U/C vehicle. At the pre-determined location, CW-1 provided investigators with a Glock 45, 9mm pistol, serial number AGGE381, and a BRG9 Elite, 9mm pistol, serial number TG019-22C1563. CW-1, and the U/C vehicle, were searched again for contraband and currency with negative results. It should be noted that the electronic recording system in the U/C vehicle malfunctioned shortly after CW-1's arrival at the Yarmouth Resort. I have reviewed the body worn audio/video recording and the audio appears consistent with a transaction (in Brazilian Portuguese) between CW-1 and FERREIRA-PEIXOTO.

### *JUNE 11, 2024 – CONTROLLED BUY FROM FERREIRA-PEIXOTO*

18. On June 11, 2024, CW-1 made a controlled purchase of a .40 caliber pistol and a 9mm pistol from FERREIRA-PEIXOTO at the Yarmouth Resort in West Yarmouth, MA. Prior to the controlled purchase, investigators met with CW-1 at a pre-determined location to conduct a pre-operational briefing. CW-1 was equipped with electronic surveillance equipment, as well as a U/C vehicle, to record and monitor the transaction. Agents provided CW-1 with government funds to purchase the firearms. CW-1 and the U/C vehicle were searched for contraband and currency with negative results.

19. Surveillance personnel were assigned to the area of the Yarmouth Resort and CW-1 was under constant surveillance by investigators during the operation. Upon arrival at the Yarmouth Resort, CW-1 parked the U/C vehicle in the east side parking lot of the hotel. Surveillance personnel observed the black Ford Fusion (MA 5VFP11) parked in the lot nearby the U/C vehicle.

20. Surveillance personnel observed FERREIRA-PEIXOTO walk from the hotel towards the Ford Fusion carrying a white plastic bag. FERREIRA-PEIXOTO accessed the trunk of the Ford Fusion and then walked over to, and got into, the U/C vehicle. While inside of the U/C vehicle, FERREIRA-PEIXOTO sold CW-1 two pistols for $3,000. CW-1 and FERREIRA-PEIXOTO discussed future firearm sales.

21. CW-1 left the area and was kept under surveillance to a pre-determined location. Surveillance personnel observed FERREIRA-PEIXOTO walk from the U/C vehicle to the black Ford Fusion where he accessed the trunk and driver's side area of the vehicle. FERREIRA-PEIXOTO walked back towards the hotel, before turning around, and walking back to the Ford Fusion. FERREIRA-PEIXOTO then drove out of the hotel lot in the Ford Fusion.

22. At the pre-determined location, CW-1 provided investigators with a Sig Sauer, P320, .40 caliber pistol, serial number 58C096426, and a PMF, 9mm pistol, with no serial number. CW-1, and the U/C vehicle, were searched again for contraband and currency with negative results. I have reviewed the recordings of the transaction, which confirmed CW-1's account that CW-1 purchased the two pistols from FERREIRA-PEIXOTO.

### *JUNE 14, 2024 – CONTROLLED BUY FROM FERREIRA-PEIXOTO*

23. On June 14, 2024, CW-1 made a controlled purchase of a 9mm pistol from FERREIRA-PEIXOTO at the Yarmouth Resort in West Yarmouth, MA. Prior to the controlled purchase, investigators met with CW-1 at a pre-determined location to conduct a pre-operational briefing. CW-1 was equipped with electronic surveillance equipment, as well as a U/C vehicle, to record and monitor the transaction. Agents provided CW-1 with government funds to purchase the firearm. CW-1, and the U/C vehicle, were searched for contraband and currency with negative results.

24. Surveillance personnel were assigned to the area of the Yarmouth Resort and CW-1 was under constant surveillance by investigators during the operation. Upon arrival at the Yarmouth resort, CW-1 parked the U/C vehicle in the east side parking lot of the hotel. Surveillance personnel observed the black Ford Fusion (MA 5VFP11) parked in the lot nearby the U/C vehicle.

25. Surveillance personnel observed a silver pickup truck arrive at the hotel's front entrance / lobby area and leave after a brief period. Shortly thereafter, surveillance personnel observed FERREIRA-PEIXOTO walk from the rear of the main entrance / lobby area to the U/C vehicle. While inside of the U/C vehicle, FERREIRA-PEIXOTO sold CW-1 a 9mm pistol for $1,700 government funds. CW-1 informed agents that FERREIRA-PEIXOTO indicated he was

7

going to travel back to North Carolina in the future to acquire additional firearms. CW-1 further reported that FERREIRA-PEIXOTO told him/her that he was late during the first transaction (June 6, 2024), because he had been traveling back from North Carolina.

26. CW-1 left the area and was kept under surveillance to a pre-determined location. FERREIRA-PEIXOTO exited the U/C vehicle and walked over to, and boarded, the Ford Fusion. FERREIRA-PEIXOTO exited the hotel parking lot onto Main Street in the Ford Fusion.

27. At the pre-determined location, CW-1 provided investigators with a Glock 17, 9mm pistol, serial BKK798US. CW-1, and the U/C vehicle, were searched again for contraband and currency with negative results. I have reviewed the recordings of the transaction, which confirmed CW-1's account that CW-1 purchased the 9mm pistol from FERREIRA-PEIXOTO.

### *AUGUST 12, 2024 – CONTROLLED BUY FROM FERREIRA-PEIXOTO*

28. On August 5, 2024, CW-1 informed agents that he/she had communicated with FERREIRA-PEIXOTO. CW-1 reported that FERREIRA-PEIXOTO sent him/her a photograph of an AR-15 style rifle. CW-1 reported FERREIRA-PEIXOTO told him/her that he would be traveling to North Carolina to acquire the firearm. On August 6, 2024, CW-1 informed agents that FERREIRA-PEIXOTO told him/her he was in North Carolina and on August 7, 2024, FERREIRA-PEIXOTO sent CW-1 a video of what appeared to be the same AR-15 style rifle. FERREIRA-PEIXOTO told CW-1 that he was going to acquire additional firearms that would be available for sale. On August 10, 2024, CW-1 reported FERREIRA-PEIXOTO told him/her that he was back in Massachusetts and had acquired at least one rifle. I later directed CW-1 to arrange the purchase of the rifle from FERREIRA-PEIXOTO.

29. On August 11, 2024, CW-1 made a controlled purchase of a .223 caliber rifle from FERREIRA PEIXOTO at the Yarmouth Resort in West Yarmouth, MA. Prior to the controlled

purchase, investigators met with CW-1 at a pre-determined location to conduct a pre-operational briefing. CW-1 was equipped with electronic surveillance equipment, as well as a U/C vehicle, to record and monitor the transaction. Agents provided CW-1 with government funds to purchase the firearm. CW-1, and the U/C vehicle, were searched for contraband and currency with negative results.

30. Surveillance personnel were assigned to the area of the Yarmouth Resort and CW-1 was under constant surveillance by investigators during the operation. Upon arrival at the Yarmouth Resort, CW-1 parked the U/C vehicle in the east side parking lot of the hotel. Surveillance personnel observed three younger Brazilian males standing outside of Room 250 on the second-floor landing. One of the males, wearing a red shirt, as more fully detailed below, was later identified as Lucas NASCIMENTO-SILVA.

31. Surveillance personnel observed FERREIRA-PEIXOTO walk from the hotel towards the U/C vehicle holding what appeared to an object concealed in a blanket(s). FERREIRA-PEIXOTO placed the blanket(s) on the rear passenger seat of the U/C vehicle and entered the front passenger seat. While inside of the U/C vehicle, FERREIRA-PEIXOTO sold CW-1 a .223 caliber rifle for $3,500 government funds. FERREIRA-PEIXOTO told CW-1 that he had another rifle available for sale and CW-1 arranged to purchase the firearm on a later date.

32. CW-1 left the area and was kept under surveillance to a pre-determined location. FERREIRA-PEIXOTO exited the U/C vehicle and walked back towards the hotel holding the blanket. Surveillance personnel observed FERREIRA-PEIXOTO throw the blanket up to two of the males that were still standing on the second-floor landing. The males then entered Room 250, while FERREIRA-PEIXOTO walked back towards a middle hallway located on the first floor.

33. Shortly thereafter, surveillance observed the same male wearing a red shirt, NASCIMENTO-SILVA, walk out from the first-floor hallway and enter a Toyota Prius (MA 4GCP23). NASCIMENTO-SILVA subsequently left the hotel in the Toyota Prius.

34. At the pre-determined location, CW-1 provided investigators with a Stag Arms, Stag-15, multi-caliber rifle (chambered in .223), serial number 176738. CW-1, and the U/C vehicle, were searched again for contraband and currency with negative results. I have reviewed the recording of the transaction, which confirmed CW-1's account that CW-1 purchased the rifle from FERREIRA-PEIXOTO.

### CW-1 CONTACT WITH NASCIMENTO-SILVA

35. On the evening of August 12, 2024, following the controlled purchase, CW-1 informed agents that he/she was introduced to an individual known to him/her as "Lucas." CW-1 later reviewed booking photographs of NASCIMENTO-SILVA and confirmed NASCIMENTO-SILVA is the individual he/she knows as "Lucas."

36. CW-1 reported NASCIMENTO-SILVA was one of the individuals standing on the second-floor landing of the Yarmouth Resort during the controlled purchase with FERREIRA-PEIXOTO earlier that day. CW-1 reported NASCIMENTO-SILVA was the male wearing the red shirt. CW-1 reported NASCIMENTO-SILVA showed him/her a Taurus .380 caliber pistol and offered to sell the pistol for $900. CW-1 provided agents with a photograph of the pistol. I later directed CW-1 to arrange the purchase of the pistol from NASCIMENTO-SILVA.

37. CW-1 reported NASCIMENTO-SILVA told him/her that he had previously driven FERREIRA-PEIXOTO to South Carolina to acquire firearms. CW-1 reported NASCIMENTO-SILVA told him/her that he had a family member in South Carolina involved in acquiring the firearms and that NASCIMENTO-SILVA could obtain additional firearms for sale. CW-1

reported NASCIMENTO-SILVA asked him/her not to tell FERREIRA-PEIXOTO that they would be doing business together.

### *AUGUST 15, 2024 – CONTROLLED BUY FROM FERREIRA-PEIXOTO*

38.     On August 15, 2024, CW-1 made a controlled purchase of a .223 caliber rifle, a .223 caliber pistol, and 73 rounds of .223 caliber ammunition from Alason FERREIRA-PEIXOTO in Centerville, MA. Prior to the controlled purchase, investigators met with CW-1 at a pre-determined location to conduct a pre-operational briefing. CW-1 was equipped with electronic surveillance equipment, as well as a U/C vehicle, to record and monitor the transaction. Agents provided CW-1 with government funds to purchase the firearms. CW-1, and the UC vehicle, were searched for contraband and currency with negative results.

39.     Prior to departing the brief location, CW-1 reported FERREIRA-PEIXOTO directed him/her to meet at 16 Patriot Way in Centerville, MA. CW-1 reported FERREIRA-PEIXOTO advised he had an additional rifle, magazines, and ammunition available for sale. At the direction of agents, CW-1 negotiated to acquire the additional rifle and ammunition, to be paid for on a later date.

40.     Surveillance personnel were assigned to the area of 16 Patriot Way. Investigators additionally employed the use of an airborne asset to assist in surveillance operations due to approach difficulties in the residential area in which 16 Patriot Way is located. CW-1 was under constant surveillance to 16 Patriot Way. Upon arrival at 16 Patriot Way, surveillance personnel observed FERREIRA-PEIXOTO and two other males, including NASCIMENTO-SILVA, standing in front of 16 Patriot Way.

41.     CW-1 parked the U/C vehicle in the driveway of 16 Patriot Way.  A Toyota Prius (MA 4GCP23) was parked in the driveway ahead of the U/C vehicle. FERREIRA-PEIXOTO

subsequently walked back towards the house and retrieved a black rifle bag from behind a tree. FERREIRA-PEIXOTO then entered the rear passenger seat of the U/C vehicle. Inside of the U/C vehicle, FERREIRA-PEIXOTO sold two firearms, ammunition, and magazines, to CW-1 for $3,500. CW-1 reported he/she observed NASCIMENTO-SILVA outside of the residence but did not interact with him.

42. CW-1 left the area and was kept under constant surveillance back to a pre-determined location. Surveillance personnel observed the three males enter the Toyota Prius and leave 16 Patriot Way towards Old Stage Road. During this time, I observed NASCIMENTO-SILVA in the driver's seat and FERREIRA-PEIXOTO in the front passenger seat.

43. At the pre-determined location, CW-1 provided investigators with: (1) a Palmetto State Armory, PA-15, multi-caliber rifle (chambered in .223), serial number LW295346; (2) a Wilson Combat, multi-caliber pistol (chambered in .223), serial number WCA31796; and (3) 73 rounds of .223 caliber ammunition. The firearms, ammunition, and magazines were located in a black Redfield rifle bag. CW-1, and the U/C vehicle, were searched again for contraband and currency with negative results. I have reviewed the recordings of the transaction, which confirmed CW-1's account that CW-1 purchased the firearms and ammunition from FERREIRA-PEIXOTO.

### AUGUST 15, 2024 – CONTROLLED BUY FROM NASCIMENTO-SILVA

44. On August 15, 2024, directly following the controlled purchase from FERREIRA-PEIXOTO in Centerville, MA, CW-1 made a controlled purchase of a .380 caliber pistol from NASCIMENTO-SILVA in Hyannis, MA. Prior to the controlled purchase, investigators met with CW-1 at a pre-determined location to conduct a pre-operational briefing. CW-1 was equipped with electronic surveillance equipment, as well as a U/C vehicle, to monitor

and record the transaction. Agents provided CW-1 with government funds to purchase the firearm. CW-1 and the U/C vehicle were searched for contraband and currency with negative results.

45. Surveillance personnel were assigned to the area of the Home Depot in Hyannis, MA. CW-1 was under constant surveillance to the Home Depot parking lot. Prior to CW-1's arrival, surveillance personnel observed the Toyota Prius (MA 4GCP23) parked in the Home Depot lot, occupied by two males. Upon CW-1's arrival at Home Depot, surveillance personnel observed the Toyota Prius drive towards, and park next to, the U/C vehicle.

46. NASCIMENTO-SILVA exited the driver's seat of the Toyota Prius and entered the U/C vehicle. While inside of the U/C vehicle, NASCIMENTO-SILVA sold CW-1 a .380 caliber pistol for $900 government funds. NASCIMENTO-SILVA exited the U/C vehicle and left the Home Depot in the Toyota Prius.

47. CW-1 left the area and was kept under constant surveillance back to a pre-determined location. At the pre-determined location, CW-1 provided investigators with a Taurus PT738 TCP, .380 caliber pistol, serial number 1D055065, and 13 rounds of .380 caliber ammunition. CW-1, and the U/C vehicle, were searched again for contraband and currency with negative results. I have reviewed the recordings of the transaction, which confirmed CW-1's account that CW-1 purchased the firearm and ammunition from NASCIMENTO-SILVA.

### *AUGUST 20, 2024, - CONTROLLED BUY FROM FERREIRA-PEIXOTO*

48. On August 20, 2024, CW-1, at the direction of agents, arranged to purchase a 9mm pistol from FERREIRA-PEIXOTO for $1,500. CW-1 additionally arranged to facilitate payment to FERREIRA-PEIXOTO, for the firearm acquired on August 15, 2024, with a negotiated agreement to pay on a later date ($3,500) for a collective amount of $5,000.

49. Prior to the controlled purchase, CW-1 informed agents that FERREIRA-PEIXOTO had another rifle that was available for sale. At the direction of agents, CW-1 arranged to additionally acquire the rifle. CW-1 reported FERREIRA-PEIXOTO agreed to provide the additional rifle, to be paid for on a later date, for a price of $3,500.

50. Investigators met with CW-1 at a pre-determined location to conduct a pre-operational briefing. CW-1 was equipped with electronic surveillance equipment, as well as a U/C vehicle, to monitor and record the transaction. Agents provided CW-1 with government funds to purchase the firearms. CW-1 and the U/C vehicle were searched for contraband and currency with negative results.

51. CW-1 was initially directed by FERREIRA-PEIXOTO to meet at the Yarmouth Resort. Upon arrival at the Yarmouth Resort, FERREIRA-PEIXOTO directed CW-1 to meet at 58 Traders Lane in West Yarmouth. CW-1 was kept under constant surveillance from the brief location to the Yarmouth Resort, and then onto Traders Lane.

52. Upon arrival at 58 Traders Lane, CW-1 reported he/she parked the U/C vehicle in the driveway, next to the black Ford Fusion. CW-1 reported FERREIRA-PEIXOTO walked out of 58 Traders Lane with the firearms concealed in a pillow. Inside of the U/C vehicle, FERREIRA-PEIXOTO sold a 9mm pistol and .223 caliber rifle to CW-1 for $5,000 government funds. CW-1 reported he/she observed FERREIRA-PEIXOTO exit the U/C vehicle and walk back inside of 58 Traders Lane following the transaction.

53. CW-1 left the area and drove to a pre-determined location. At the pre-determined location, CW-1 provided investigators with a pillow, containing: (1) a Radical Firearms, RF-15, multi-caliber rifle (chambered in .223), serial number 23-051127, and (2) a Taurus G2C, 9mm pistol, serial number TMS52803. Agents noted that the lower and upper receiver of the Radical

Firearms rifle were separated. Agents believe the receivers were separated in order to conceal the firearm inside of the pillow. CW-1, and the U/C vehicle, were searched for contraband and currency with negative results. I have reviewed the recording of the transaction, which confirmed CW-1's account that CW-1 purchased the firearms from FERREIRA-PEIXOTO.

### *AUGUST 23, 2024 – CONTROLLED BUY FROM NASCIMENTO-SILVA*

54. On August 23, 2024, CW-1 made a controlled purchase of two 9mm pistols from NASCIMENTO-SILVA in Hyannis, MA. Prior to the controlled purchase, investigators met with CW-1 at a pre-determined location to conduct a pre-operational briefing. CW-1 was equipped with electronic surveillance equipment, as well as a U/C vehicle, to monitor and record the transaction. Agents provided CW-1 with government funds to purchase the firearms. CW-1 and the U/C vehicle were searched for contraband and currency with negative results.

55. Surveillance personnel were assigned to the area of the Home Depot in Hyannis, MA.  CW-1 was under constant surveillance to the Home Depot parking lot. Upon CW-1's arrival at Home Depot, surveillance personnel observed NASCIMENTO-SILVA standing outside of a white Hyundai Elantra (MA 4GET43) in the Home Depot parking lot. CW-1 proceeded to park next to the Hyundai Elantra and NASCIMENTO-SILVA entered the U/C vehicle.

56. Inside of the U/C vehicle, NASCIMENTO-SILVA sold CW-1 two 9mm pistols for $2,700 government funds. CW-1 reported he/she discussed arranging future firearm sales with NASCIMENTO-SILVA. NASCIMENTO-SILVA exited the U/C vehicle and left the Home Depot in the Hyundai Elantra. Surveillance personnel observed NASCIMENTO-SILVA to be the lone occupant of the vehicle.

57. CW-1 left the Home Depot and was escorted directly to a pre-determined location. At the pre-determined location, CW-1 provided investigators with a Glock 19GEN4,

9mm pistol, serial number BFSX638, and a Glock 43X, 9mm pistol, serial number AKBX709. CW-1 and the U/C vehicle were searched again for contraband and currency with negative results. I have reviewed the recording of the transaction, which confirmed CW-1's account that CW-1 purchased the firearms from NASCIMENTO-SILVA.

### *AUGUST 30, 2024 – CONTROLLED BUY FROM FERREIRA-PEIXOTO*

58. CW-1, at the direction of agents, arranged to purchase two pistols from FERREIRA-PEIXOTO on August 30, 2024. CW-1 negotiated to pay FERREIRA-PEIXOTO $3,500 for the Radical Firearms RF-15 rifle (purchased on August 20th) and pay $3,000 for the two pistols on a later date ($1,500 each). On August 29, 2024, CW-1 informed agents that FERREIRA-PEIXOTO told him/her that he had moved off of Cape Cod and was presently renting in Fall River, MA. CW-1 reported FERREIRA-PEIXOTO sent him his location, as well as a message, with the address of "85 rhode island ave fall river ma 02724."

59. On August 30, 2024, prior to the controlled purchase, investigators met with CW-1 at a pre-determined location to conduct a pre-operational briefing. CW-1 was equipped with electronic surveillance equipment, as well as a U/C vehicle, to monitor and record the transaction. Agents provided CW-1 with government funds to purchase the firearms. CW-1 and the U/C vehicle were searched for contraband and currency with negative results.

60. Surveillance personnel were assigned to the area of 85 Rhode Island Avenue in Fall River, MA. CW-1 was under constant surveillance from the brief location to 85 Rhode Island Avenue. It should be noted that 85 Rhode Island Avenue is a multi-unit apartment building with a parking lot located towards the front. Surveillance personnel observed FERREIRA-PEIXOTO walk out of 85 Rhode Island Avenue and enter the front passenger seat of the U/C vehicle. Inside of the U/C vehicle, FERREIRA-PEIXOTO sold CW-1 a 9mm pistol and a .380

caliber pistol in exchange for the $3,500 government funds. Following the transaction, FERREIRA-PEIXOTO walked back inside of 85 Rhode Island Avenue.

61. CW-1 was escorted directly back to a pre-determined location. At the pre-determined location, CW-1 provided investigators with a Taurus G3C, 9mm pistol, S/N AEE417609, and a Ruger LCP, .380 caliber pistol, serial number 379037426. CW-1 and the U/C vehicle were searched again for contraband and currency with negative results. I have reviewed the recording of the transaction, which confirmed CW-1's account that CW-1 purchased the firearms from FERREIRA-PEIXOTO.

### SEPTEMBER 4, 2024 – CONTROLLED BUY FROM NASCIMENTO-SILVA

62. On September 4, 2024, CW-1, arranged to purchase two (2) pistols from NASCIMENTO-SILVA in Hyannis, MA. During the morning of September 4th, CW-1 informed agents that NASCIMENTO-SILVA stated he had an AR-15 style rifle available for sale for $2,000. At the direction of agents, CW-1 arranged to acquire the rifle to be paid on a later date.

63. Prior to the controlled purchase, investigators met with CW-1 at a pre-determined location to conduct a pre-operational briefing. CW-1 was equipped with electronic surveillance equipment, as well as a U/C vehicle, to monitor and record the transaction. Agents provided CW-1 with government funds to purchase the firearms. CW-1 and the U/C vehicle were searched for contraband and currency with negative results.

64. Surveillance personnel were assigned to the Home Depot in Hyannis, MA. CW-1 was under constant surveillance to the Home Depot parking lot. Upon arrival, CW-1 parked the U/C vehicle towards the back corner, next to a white Ford Fusion with heavily tinted windows (MA 2ASD91). NASCIMENTO-SILVA subsequently exited the front passenger seat of the Ford Fusion and got into the front seat of the U/C vehicle. Inside of the U/C vehicle,

NASCIMENTEO-SILVA produced two pistols from his waistband and handed them to CW-1. NASCIMENTO-SILVA then exited the U/C vehicle and accessed the rear of the Ford Fusion, before placing a .223 caliber rifle on the backseat of the U/C vehicle. CW-1 paid NASCIMENTO-SILVA $2,700 government funds in exchange for the firearms.

65.     NASCIMENTO-SILVA then entered the front passenger seat of the Ford Fusion and left the area. CW-1 departed the Home Depot and was escorted to a pre-determined location. At the pre-determined location, CW-1 provided investigators with: (1) a JD Machine Model TR1, multi-caliber rifle (chambered in .223), serial number 08014: (2) a Glock 23, .40 caliber pistol, serial number BUSK830; and (3) a Glock 42, .380 caliber pistol, serial number AGBW724. CW-1 and the U/C vehicle were searched again for contraband and currency with negative results. I have reviewed the recording of the transaction, which confirmed CW-1's account that CW-1 purchased the firearms from NASCIMENTO-SILVA.

## *FEDERAL FIREARMS LICENSE (FFL)*

66.     As part of this investigation, I have consulted with an ATF Industry Operations Investigator (IOI) in the Boston Field Division, who has queried ATF's Firearms Licensing System (FLS). As a result of these queries, it was determined that neither Alason FERREIRA-PEIXOTO nor Lucas NASCIMENTO-SILVA possesses a federal firearms license.

## CONCLUSION

67. In light of the above, there is probable cause to believe that FERREIRA-PEIXOTO and NASCIMENTO-SILVA, have committed violations of federal law as set forth above.

*Eric Mercer /by Paul G. Levenson*
Eric Mercer
Special Agent, ATF

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by

_____
HON. PAUL G. LEVENSON
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

on this __17th__ day of September, 2024